IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FILED

AUG 15 2017

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA

v.                                      Criminal No. 3:17cr25

JULIOUS BROWN

## MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 14)
("Def's Mtn. to Suppress") filed by Julious Brown. Brown's
motion seeks suppression of all evidence seized from the
automobile in which Brown was a passenger, as well as all
statements made by Brown. For the reasons set forth below,
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN
SUPPORT (ECF No. 14) will be denied.

## FACTUAL BACKGROUND

The facts are based on testimony given at the suppression
hearing. They are augmented by a video and audio recording of
the traffic stop made by the camera in the police car of the
officer who conducted the stop.

On January 19, 2017, Virginia Senior Trooper Homiak was on
duty near the northbound ramp at Exit 13 on Interstate 95N in
Greenville County, Virginia. Homiak was parked in the median

when he noticed a small group of cars driving past him, with one vehicle, a dark blue Chevy Malibu ("Malibu") in the left lane, approximately 1½ car lengths behind another vehicle.[1] After the group of cars passed, Homiak pulled onto the highway. The driver of the Malibu then pushed on the brakes and got behind a semi-truck, following at approximately one car length distance. Homiak caught up to the Malibu which, by then was proceeding below the speed limit. Homiak initiated a traffic stop for the violation of "following too closely." The Malibu pulled over onto the right shoulder and came to a stop.

Homiak approached the vehicle, identified himself as a law officer, and explained to the driver that she was "following too closely," and asked the driver for her license. The driver, Laquida Donyel Henderson, produced a North Carolina license. Henderson's residence was in North Carolina. She told Homiak that the vehicle was a rental car and produced the rental car agreement. Homiak noticed that Henderson's hands were shaking "uncontrollably" as she passed the documents to him. Homiak also noticed that Brown, the passenger, was breathing "heavily and his chest was pounding." Homiak saw a prepaid phone on the

---

[1] Homiak testified: "The vehicle, as it passed [], was about a car length and a half behind the vehicle that was in front of it, and at 70 miles an hour, that is following much too close to be able to stop if the person slammed on [sic]brakes. It would result in an accident."

2

passenger side floor board with the battery removed. Homiak told Henderson that he was going to check the status of her driver's license and asked her to accompany him to his patrol vehicle.

While in the patrol vehicle, Homiak reviewed the rental agreement which showed that Henderson had rented the vehicle in North Carolina. Homiak began to check Henderson's driving record by way of a computer query, and, while that process was underway, he questioned Henderson about her chosen path of travel and destination. Henderson reported that Brown was her boyfriend and that they were traveling to Philadelphia and then to New Jersey to visit family. Henderson also testified that earlier in the morning, she drove to pick up a rental car because she did not want to put miles on her vehicle. She then picked up Brown from her home and the couple traveled to Warrenton, North Carolina where Brown visited with a friend. After that, they traveled approximately 30 minutes to Rocky Mountain, North Carolina to get chicken at a Zaxby's restaurant.

When asked why she did not use Interstate 85 (a more logical route of travel considering the starting point of their journey), Henderson indicated that she may be lost. Homiak went back to the vehicle to speak with Brown. Homiak observed that Brown continued to "breathe heavily". Brown did not have any

3

form of identification other than a credit card with his name on it, but reported his name, date of birth and social security number to Homiak. Brown told Homiak that he was going to make a stop in Virginia and then he was going to New Jersey to see his sister for a few days.

After speaking with Brown, Homiak returned to his patrol vehicle to see whether the computer had yet generated Henderson's record. At this point, Homiak requested that Trooper Hernandez ("Hernandez") respond with his drug detecting canine.[2]

Homiak was aware that Interstate 95 was a prime travel route between New York (a drug source city) and points South, including North Carolina. His training and experience led Homiak to become suspicious that Henderson and Brown might be engaged in drug trafficking because both displayed signs of abnormal nervousness at the early stages of the traffic stop for a minor infraction, because of the conflicting accounts of their travel plans, because the cell phone was disabled, thereby preventing any location identification (a tactic that Homiak, from experience, knew to be used by drug traffickers), and by

[2] Homiak also had a drug detection canine in his vehicle. However, because Homiak was conducting the traffic stop, and wanted to continue to do so without delay, a second trooper with another canine was called.

4

the confusing explanation for using Interstate 95, rather than Interstate 85.

Henderson's license showed as "not on file" and Homiak reentered the information. While waiting for the computer check on Henderson's license to come back for the second time, Homiak asked Henderson where she worked and she responded that she worked at the Lowes in Henderson, North Carolina. At that time, Hernandez arrived on the scene and Homiak told him to stand by. The computer check again showed "not on file." Homiak explained to Henderson that he had one more way to check her license status. While entering the information for the third time, Homiak made a comment to Henderson about the drug problem in Henderson, North Carolina. Henderson's breathing became heavier. Homiak asked Hernandez to run the dog on the outside of the car. At this point, the vehicle had been stopped for approximately 12 minutes and 51 seconds.

The exterior scan of the car by Hernandez and his dog, Jack, took approximately one minute. During the scan, Jack snapped his head as he was passing the trunk area. After noticing the change in Jack's behavior, Hernandez went back to the area where Jack had first alerted and Jack alerted once again at the trunk of the Malibu and demonstrated the alert by sitting down near the point of alert. Homiak testified that at

5

13:42 minutes into the traffic stop, he saw the dog sit and at 14:31 minutes into the traffic stop, he told Henderson that her license came back as valid.

Homiak then proceeded to search the vehicle based on the alert given by Jack. Homiak asked Henderson what she was responsible for in the vehicle to which Henderson replied that she was responsible for driving the car and for her travel bag. Homiak asked Brown if he was responsible for anything in the vehicle and Brown responded "if you find something then its mine that she doesn't know what is going on." Homiak started the search on the passenger side of the car in the area where Brown was sitting. He did not see anything.

After Homiak opened the trunk, Brown "got a bit agitated and said that he [Homiak] needed a warrant." Brown was placed in handcuffs for the safety of the officers because Brown had become agitated and was a big, strong man. Homiak did not want to have to deal with an unrestrained, agitated Brown on the side of a busy interstate highway where someone could be hurt if Brown's agitation increased.

Homiak pulled a bag out of the trunk and Brown identified the bag as Henderson's. Homiak searched the bag and did not locate any contraband. Homiak then retrieved a black backpack from the left side of the trunk. Brown said that the backpack

6

was his.  Homiak opened the bag and located a large amount of pre-packaged bindles of suspected heroin.[3]  Homiak told Brown he was under arrest.

Homeland Security Investigators interviewed Brown at the Area 35 Police Office in Emporia.  Brown was given his Miranda rights and agreed to waive them.  Brown explained that he and Henderson had left Henderson, North Carolina that day and planned to stop in Richmond, Virginia to deliver the backpack and its contents to an individual and then proceed to Philadelphia.  Brown was going to use the flip phone to contact the recipient.  Brown knew that the backpack contained heroin and he was going to be paid $1,000.00 for delivering the product to Richmond.  Brown admitted that this was not his first trip to Richmond to deliver heroin.  He had been paid $1,000 for a previous trip.  Brown also gave the agents his consent to search the phone.

On March 7, 2017, a federal grand jury returned a one-count indictment against Brown charging him with possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B).

---

[3] The heroin seized from the trunk was individually wrapped into user-sized sale units.

## POSITIONS OF PARTIES

Brown argues that he has standing to challenge the stop pursuant to Brendlin v. California, 551 U.S. 249 (2007). Brown contends that Homiak did not have reasonable suspicion to conduct the traffic stop of the Malibu based on the Malibu following "too closely." Brown also argues that the alert by Jack, the drug dog, did not provide probable cause to continue the detention of the vehicle because Jack's training was deficient. Originally, Brown also contested the duration of the stop. During oral argument however, Brown's counsel withdrew that aspect of the motion based on the video obtained from Homiak's patrol vehicle.

While the Government does not challenge Brown's standing to contest the stop of the vehicle, the Government asserts that Brown does not have standing to challenge the search of the vehicle because he lacked any reasonable expectation of privacy in the trunk. The Government takes the view that Homiak had reasonable suspicion that a violation of a traffic law occurred to justify the stop of a vehicle. Once stopped, says the Government, Homiak properly requested the driver's license from the driver, the vehicle registration and the passenger's identification. Once the dog alerted, the nature of the stop changed and Homiak had probable cause to search the trunk for

drugs based on the canine's alert. And, according to the
Government, Jack's training and certification are legally
sufficient to support the search based on his alert.

<h2 style="text-align:center">ANALYSIS AND APPLICATION OF LAW</h2>

Brown challenges the stop of the vehicle and the search of
the vehicle, both as violative of the Fourth Amendment. Each
will be considered in turn.

## A.    Stop of the Vehicle

Brown first contests the validity of the traffic stop based
on Homiak's belief that the vehicle was "driving too closely."
While Brown has standing to challenge the stop, the stop was
reasonable and there is no basis for suppressing the seized
evidence or Brown's statements.

### 1.    As a Passenger in the Vehicle, Brown has Standing to Challenge the Stop

A person who makes a motion to suppress evidence must show
that he was "a victim of a search or seizure . . . as
distinguished from one who claims prejudice only through the
evidence gathered as a consequence of a search or seizure
directed at someone else." Jones v. United States, 362 U.S.
257, 261 (1960), overruled on other grounds, United States v.
Salvucci, 448 U.S. 83 (1980). In Brendlin v. California, 551
U.S. 249, 259 (2007), the Supreme Court explained that a

9

passenger can challenge the stop of a vehicle, if that stop was unreasonable because "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on privacy and personal security does not [] distinguish between passenger and driver." Id. at 257. (internal citations omitted).

Therefore, wholly apart from whether Brown has a legitimate expectation of privacy within the vehicle, he may challenge the reasonableness of the stop.

### 2. Trooper Homiak had Probable Cause to Conduct a Traffic Stop

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." **U.S. Const, amend. IV**. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-10 (1996) (internal citations omitted). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred." Id. That, of course, includes, even a minor traffic violation. Id. at 812-13.

Pursuant to Virginia law, **Va. Code Ann. § 46.2-816**, "[t]he driver of a motor vehicle shall not follow another vehicle, trailer, or semitrailer more closely than is reasonable and prudent, having due regard to the speed of both vehicles and the traffic on, and conditions of, the highway at the time." In this case, Homiak reported that he was patrolling on Interstate 95 in Greensville County, Virginia. He saw a small group of cars pass by and noticed that one of the vehicles in the group, a dark blue Chevy Malibu, was following another vehicle too closely. As Homiak pulled out to follow the vehicle, the driver of the Malibu slammed on its brakes and pulled behind a semi-truck. According to Homiak, the Malibu was following too close for the conditions, both when he first observed it and when the car pulled behind the truck. The Court credits Homiak's testimony and his testimony is sufficient to supply a constitutionally sound basis for the traffic stop here at issue.

## B.  Search of the Vehicle

Brown also challenges the subsequent search of the vehicle's trunk. Brown does not have standing to challenge the search of the trunk because he had no reasonable expectation of privacy therein. In any event, the search of the trunk was

11

based on probable caused and therefore, did not violate the Fourth Amendment.

### 1. **Brown Cannot Challenge the Search of the Trunk**

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165 (1969). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." Rakas v. Illinois, 439 U.S. 128, 134 (1978). "[T]he question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Id. at 140.

While a passenger may be legitimately on the premises, i.e. in the vehicle, it does not follow per force that the passenger has "a legitimate expectation of privacy in the particular areas of the automobile searched." Id. at 148. In Rakas, the Supreme Court explained that the passengers did not making a showing that "they had any legitimate expectation of privacy in the

glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." Id. at 148-49; see also United States v. Avagyan, 164 F. Supp. 3d 864, 880 (E.D. Va. 2016), aff'd sub nom. United States v. Ghazaryan, No. 16-4424, 2017 WL 1382027 (4th Cir. Apr. 18, 2017)("Rakas holds that a non-owner passenger who enjoys the owner's permission to use the car has standing to challenge a search of the particular areas of the automobile in which he has a legitimate and reasonable expectation of privacy. Non-owner passengers who have the owner's permission to be in the vehicle enjoy standing only as to items over which they have control; passengers, therefore, have no interest in the space under the driver's seat, *in the trunk,* or in a locked glovebox to which only the owner has a key.") (emphasis added).

Based on the holding in Rakas, and the decision in United States v. Avagyan, Brown does not have standing to challenge Homiak's search of the contents of the trunk. Brown's motion to suppress the yield of the search and the ensuing statements (on

the ground that the search was invalid) fails for that reason alone.[4]

Ordinarily, it is preferable to articulate a single basis for a decision, and, conversely, to refrain from making alternative holdings. Karsten v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc., 36 F.3d 8, 11 (4th Cir. 1994); Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994), aff'd, 78 F.3d 578 (4th Cir. 1996). However, given the nature of Brown's challenge to the validity of the search (the unreliability of Jack, the dog), and the fact that Brown intends to appeal the denial of his motion on that ground, it is appropriate to explain why that issue supplies no basis for granting Brown's motion.

## 2. The Canine's Alert Provided Probable Cause

Even if Brown had standing to challenge the search, the search would nonetheless be valid because Jack's alert provided probable cause. Of course, police generally may not conduct a search without a warrant. "There is a well-established exception to this requirement, however, for automobile searches." United States v. Kelly, 592 F.3d 586, 589-90 (4th

---

[4] Of course, Brown could challenge admissibility of his statements on the ground that there was no warning or an inadequate warning or on the ground that the statements were involuntary. However, he has made no such challenge.

14

Cir. 2010). If the police have probable cause to believe that a vehicle contains contraband, the police may search that vehicle with or without a warrant. See Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam).

The scan of a dog around the exterior of a car does not implicate the privacy interests protected by the Fourth Amendment, see United States v. Place, 462 U.S. 696, 707 (1983); and, an alert of a trained narcotics canine may create probable cause to justify a search of a vehicle. See Illinois v. Caballes, 543 U.S. 405, 409 (2005).

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

Florida v. Harris, 568 U.S. 237, 247 (2013).

> [D]efendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may

15

contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant. . . .

Id.

> [A] probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate. If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. In all events, the court should not prescribe, [], an inflexible set of evidentiary requirements. The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. *A sniff is up to snuff when it meets that test.*

Id. at 248 (emphasis added). The Fourth Circuit has rejected the argument that dog alert testimony must satisfy the standards for expert scientific testimony. A "dog's alert . . . would

16

serve not as actual evidence of drugs, but simply to establish probable cause to obtain a warrant to search for such substantive evidence." United States v. Allen, 159 F.3d 832, 839-40 (4th Cir. 1998).

At the hearing on the Motion to Suppress, Sergeant Jeffrey K. Annais, the agent and coordinator of the K-9 training section for the Virginia State Police, testified that he sent a memo confirming canine Jack's annual certification in June 28, 2016. He further testified that since that date, there were no notices of delinquencies or corrections for Jack and that neither Jack nor his handler, Hernandez, were ever "pulled out of service" which, under procedure, would have been required upon notice of any delinquency or need for correction. Further, Hernandez, the dog handler, confirmed the testimony given by Annais. Hernandez also testified that Jack has never falsely alerted in the field since his certification. This evidence establishes a presumption that Jack is a sufficiently reliable narcotics detection canine and that Jack's alert provided probable cause for the contested search as described in Harris.

The defense sought to undermine the reliability of Jack's alert and the validity of his certification (which occurred six months before the search) in several ways. None of those efforts were successful.

17

First, Brown sought to establish that Hernandez, Jack's handler, had not kept records showing that Jack had received the amount of continued training specified in the <u>Virginia State Police Tactical Operations Unit Canine Training Section Operations Procedures Manual</u> issued by the Virginia State Police. (Def. Ex. A). However, Hernandez testified that Jack received the requisite training during that six month period. The Court credits Hernandez's testimony, notwithstanding that his record-keeping skills are not strong.

Second, Brown points out that the procedure manual for dog training requires that a narcotic search dog receive a "four hour block of non-task related training" and that records are to be kept for "court purposes" (Def. Ex. A, ¶ 11). Brown argued that Jack received no four hour blocks of training in the six months following his certification. And, it is correct that Jack did not receive, during the applicable period, training that was for a continuous four hour duration.

Nonetheless, that ground of attack is without merit because the testimony of Hernandez and Annais confirms that no dog can undergo training for a four hour block, and that the four hour block referred to in the manual is, in actual practice, simply time that is set aside for training when the handler and the dog cannot be called out to perform actual search duties. While

18

that understanding is at odds with the text of the manual, the record is that the understanding given to that policy by Hernandez and Annais is the actual practice that is followed. And, Hernandez confirmed that Jack received training in accord with the practice. Here too, the Court credits the testimony of Hernandez.[5]

Third, Brown established that, during the training before Jack was certified, Hernandez was removed as Jack's handler and, from that evidence, Brown argues that Jack was unreliable. That contention misses the mark because, as Annais explained, the separation of Hernandez and Jack was effected because the two were becoming "too bonded," something to be avoided in the training period when the handler (Hernandez) is required to work with more than one dog. When, as sometimes happens, a handler becomes too attached to one dog, a rotation occurs. That is what happened here and nothing in the record on that topic establishes a lack of adequate training. Moreover, at the end of the day, Jack was certified and Hernandez and Jack were constituted as a team and they worked that way from certification until Hernandez took a different job with the Virginia State Police.

---

[5] The manual is poorly written in that it does not reflect this actual practice. But, it is the practice, not the manual, that in the end informs whether Jack's training was maintained.

Fourth, Brown showed that, on a few occasions in training, Jack gave false alerts. However, Hernandez explained that, on those occasions, the alert was due to a residual odor attributable to the repeated use (for training purposes) of a vehicle or container for drugs that had been used as part of previous training missions conducted by other officers. That evidence does not undermine Jack's certification or his abilities. That is particularly so where, as here, the undisputed record shows that Jack never had a false alert in an actual operation.

Brown argues that Hernandez's failure to keep the proper logs, Jack's removal from Hernandez for a period of time during his training, and Jack's false alerts during training exercises, collectively show that Jack is not a reliable canine detection dog. The Court can make no such conclusion. That argument simply ignores the fact that Jack and Hernandez were certified six months before the search at issue; that Jack was trained regularly thereafter; and that Jack has performed with great, indeed complete, accuracy in actual operations. Moreover, the argument ignores the guiding principle that:

> similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.

20

_Florida v. Harris_, 568 U.S. 237, 248 (2013). The record here establishes clearly that Jack was a reliable, well-trained, and effective-on-the-job- narcotics dog and that, in the words of Justice Kagan, his "sniff is up to snuff."

### 3. The Extent of the Search was Permissible

Although Jack alerted in the trunk area, Brown argues that Jack's alert did not permit a search of the backpack that was in the trunk of the car. It is true that "probable cause to search one compartment or container within a car does not invariably provide probable cause to search the entire vehicle . . . ." _United States v. Kelly_, 592 F.3d 586, 592 (4th Cir. 2010). However, a "dog's alerting [at a driver's door] was sufficiently close to the trunk to give [the officer] probable cause to believe it contained contraband." _United States v. Carter_, 300 F.3d 415, 422 (4th Cir. 2002)(citing _Kelly_, 592 F.3d at 592).

Jack alerted by the trunk of the vehicle. Homiak's search of the trunk was based on that alert, thus, the search of two different bags that were located in the trunk does not violate the Fourth Amendment. As the Court explained in _Carter_, "odors travel within a car and seep through loose seals into the outside environment." 300 F.3d at 422. Thus, an alert at the trunk of the car is a sufficient basis to believe that drugs may

be found in either of the two bags that were located in the trunk. Moreover, when Homiak asked Brown whether he was responsible for anything in the trunk (before Homiak searched the backpack), Brown replied "if you find something then its mine she doesn't know what's going on." This statement, reasonably construed in perspective of the fact that Jack had alerted, augmented the probable cause that there was contraband in the trunk and in the backpack that Brown identified as belonging to him. Therefore, Homiak's search of the trunk and the backpack was not in violation of the Fourth Amendment and the drugs found in the backpack and Brown's subsequent incriminating statements are not to be suppressed.

## CONCLUSION

For the reasons set forth above, DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT (ECF No. 14) was denied. (ORDER, ECF No. 35).

It is so ORDERED.

_____ /s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _14_, 2017